## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

ANGELA HALL and
ERIK HALL,

                    Plaintiffs,

*v.*                                          CIVIL ACTION NO.   3:22-0277

PUTNAM COUNTY COMMISSION,
a Political Subdivision of the State of West Virginia;
DEPUTY SHERIFF HEATHER D. GRIMMITT, an individual;
DEPUTY SHERIFF B. W. PAULEY, an individual,
DEPUTY SHERIFF STEVEN MARTIN, an individual;
DEPUTY SHERIFF BRIAN HUDSON, an individual;
DEPUTY SHERIFF DONATHAN JUDE, an individual;
DEPUTY SHERIFF J. B. GRIMMETT, an individual; and
DEPUTY SHERIFF VEITH, an individual,

                    Defendants.

### MEMORANDUM OPINION & ORDER

Before the Court are four motions: (1) Plaintiffs' Motion for Partial Summary Judgment on Liability ("Pls.' Liability Mot."), ECF No. 151; (2) Plaintiffs' Motion for Partial Summary Judgment on *Monell* Liability ("Pls.' *Monell* Mot."), ECF No. 161; (3) Defendants Heather D. Grimmett, J.B. Grimmett, & Deputy Vieth's Motion for Summary Judgment ("Grimmett Mot."), ECF No. 138; and (4) Defendants Brian Hudson, Donathan Jude, Steve Martin, Brandon Pauley, & Putnam County Commission's Motion for Summary Judgment ("Pauley Mot."), ECF No. 179.[1]

---

[1] On February 7, 2024, Defendants filed corrected summary judgment briefing after inadvertently omitting Donathan Jude from their initial summary judgment motion. *See* ECF No. 178 at 1–2. The corrected briefing replaces Defendants Putnam County Commission, Brandon Pauley, Steve Martin, and Brian Hudson's Motion for Summary Judgment (ECF No. 140).

Upon review, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment on Liability; **DENIES** Plaintiffs' Motion for Partial Summary on *Monell* Liability; **GRANTS** Defendants Heather B. Grimmett, J.B. Grimmett, and Deputy Veith's Motion for Summary Judgment; and **GRANTS** Defendants Brian Hudson, Donathan Jude, Steve Martin, Brandon Pauley, & Putnam County Commission's Motion for Summary Judgment.[2]

## FACTUAL BACKGROUND

At 12:56 AM on November 3, 2021, emergency responders received a call from the home of Erik and Angela Hall. *See* Pauley Mot., Ex. 5 at 2, ECF No. 140-5. The call was brief. A woman cried and hung up. *See id.* Worried, emergency responders dispatched Deputies Brandon Pauley, Brian Hudson, Steven Martin, and trainee Donathan Jude to the scene. *See id.*, Ex. 5 at 1.[3]

Minutes later—at 1:03 AM—emergency responders received a second call—this time from the Hall's neighbor. *See* Pauley Mot., Ex. 5 at 2. On this call, the Hall's two minor children informed responders their parents were fighting. *See id.* During the fight, Mr. Hall made threats

---

[2] The Court also considered Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment on Liability ("Pls.' Mem. Liability"), ECF No. 152; Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment on Liability ("Defs.' Resp. Liability"), ECF No. 158; Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment on Liability ("Pls.' Reply Liability"), ECF No. 165; Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment on *Monell* Liability ("Pls.' Mem. Monell"), ECF No. 162; Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment on *Monell* Liability ("Defs.' Resp. Monell"), ECF No. 159; Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment on *Monell* Liability ("Pls.' Reply Monell"), ECF No. 164; Defendants Putnam County Commission, Brandon Pauley, Steve Martin, & Brian Hudson's Memorandum of Law in Support of Their Motion for Summary Judgment ("Pauley Mem."), ECF No. 141; Plaintiffs' Response in Opposition to Defendants Putnam County Commission, Brandon Pauley, Steven Martin, & Brian Hudson's Motion for Summary Judgment ("Pls.' Resp. to Pauley Mot."), ECF No. 155; Defendants' Putnam County Commission, Brian Hudson, Steve Martin, Brandon Pauley, & Donathan Jude's Reply to Plaintiffs' Response in Opposition to their Motion for Summary Judgment ("Pls.' Reply to Pauley Mot."), ECF No. 166; Defendants' Heather B. Grimmett, J.B. Grimmett, & Deputy Veith's Memorandum of Law in Support of Motion for Summary Judgment ("Grimmett Mem."), ECF NO. 139; Plaintiffs' Response in Opposition to Defendants Heather D. Grimmett, J.B. Grimmett, & Deputy Veith's Motion for Summary Judgment ("Pls.' Grimmett Resp."), ECF No. 156; Defendants Heather D. Grimmett, J.B. Grimmett, & J.T. Vieth's Reply to Plaintiffs' Response in Opposition to their Motion for Summary Judgment ("Grimmett Reply"), ECF No. 167.

[3] Jude no longer works for the Putnam County Sheriff's Department. *See* Grimmett Mot., Ex. 4 at 2, ECF No. 140-4.

with a pistol and hit Mrs. Hall and a child. *See id.* The children ran to a neighbor's house for refuge. *See id*. The emergency responders relayed the situation to the officers. *See id.*, Ex. 5 at 2.

At 1:36 AM, the officers arrived at the Hall residence. *See id.* They knocked on the door. No one answered. *See id.*, Ex. 1 at 1, ECF No. 140-1. Concerned, the officers circled the home. *See id.*; *id.*, Ex. 5 at 2. At 1:46 AM, they entered the home and searched for signs of life. *See id.*

At some point, Martin went to the neighbor's home to check on the minor children. *See* Pauley Dep. 19:11–20:4, ECF No. 140-18. He took statements from both children. *See* Pauley Mot., Ex. 8 ECF No. 140-8.; *id.*, Ex. 9, ECF No. 140-9. One statement explains Mr. Hall "grabbed" Mrs. Hall's wrist, threw her vape and "started hitting" her. *Id.*, Ex. 8 at 1. She could hear "screaming." *Id.* When the daughter came to investigate, Mr. Hall "grabbed" her and "started almost choking" her. *Id.* He then smashed the daughter's phone. *See id.* Mr. Hall then "shoved" the daughter. *Id.* When Mrs. Hall instructed the daughters to call 911, Mr. Hall "got mad and started beating her again." *Id.* The other statement corroborates Mr. Hall's violence. *See id.*, Ex. 9 at 1 (revealing Mr. Hall "made [Mrs. Hall] come upstairs by dragging her by the arm"). Throughout this time, Pauley communicated with Martin "via the radio." Pauley Dep. 20:13–15.

Mrs. Hall returned home. *See id.*, Ex. 1 at 1; A. Hall Dep. 53:24, ECF No. 140-15. An officer approached Mrs. Hall, told her that her children were safe, and asked her to make a statement about the night's events. *See id.* at 59:16–61:15; Pauley Dep. 20:8–12.

At 1:59 AM, Jude recorded Mrs. Hall's first statement in her kitchen. *See* Pauley Mot., Ex. 6, ECF No. 140-6; A. Hall Dep. 67:10–11. In the statement, Mrs. Hall states Mr. Hall "came home drunk" ready to "argue and fight." Pauley Mot., Ex. 6 at 0:24–0:28. She then hesitated to say more because last time the police came to resolve one of their disputes "sh*t got real bad." *Id.* at 0:35– 0:50. Jude responded the police would do "everything in [their] power to help [her] out." *Id.* at

0:51–0:56. Altogether, the statement lasted less than two minutes. *See id.* Jude stopped the recording when car lights passed by the residence. *See* Pauley Dep. at 26:3–10. Pauley and Jude stepped outside. *See id.* at 33:8–10. They returned about seven minutes later. *See id.* at 33:12–13.

At 2:09 AM, Pauley recorded a second statement. *See* Pauley Mot., Ex. 7, ECF No. 140-7. In this statement, Mrs. Hall acknowledged "her daughter went [to] the neighbors and called" 911 twice. *Id.* at 0:20–0:24; 0:45–0:52. An argument broke out when she told Mr. Hall to stop driving the family's ATV at night. *See id.* at 0:24–0:30. Mr. Hall then "started to get physical, pushed [her] around," and "hit [her] in the back of the head." *Id.* at 0:30–0:37. One daughter tried to record the fracas, *see id.* at 0:58–1:16, but Mr. Hall grabbed her phone and smashed it. *See id.* at 1:16–1:22. Throughout the statement, Pauley asked Mrs. Hall questions. *See, e.g.*, *id.* at 2:03–2:06. At one point, Mrs. Hall stated Mr. Hall was "kinda swinging at me with . . . one time it was probably backhand. I know he used a closed first once, but I saw it coming and I ducked. I don't know if it grazed me." *Id.* at 2:04–2:24. Altogether, the statement lasted less than five minutes. *See id.*

After the statement, Martin "showed up" with Mrs. Hall's two children. A. Hall Dep. at 98:7. Pauley then completed a Dangerous-Lethality Information Form. *See* Pauley Dep. 41:22–42:14. On the form, Mrs. Hall attested Mr. Hall threatened her and the children, used a weapon against her, choked her, spied on her, and left threatening messages in the past. *See* Pls.' Liability Mot., Ex. D at 1, ECF No. 151-5. She claimed Mr. Hall is violent or constantly jealous, controls most of her daily activities, and had a history with drug and alcohol abuse. *See id.* at 1–2. She revealed she tried leaving him before and feared he might try to kill her. *See id.* at 1. She confirmed his behavior increased in the past few months. *See id.* at 2. At some point, Pauley checked Mrs. Hall for injuries. *See* Pauley Mot., Ex. 1 at 1.

At 2:53 AM, the officers informed emergency responders Mrs. Hall and her children were "going to [an] undisclosed location"—her mother's house. *See id.*, Ex. 5 at 2. At 3:37 AM, Mrs. Hall, her children, and the officers left the Hall residence. *See id.* Mr. Hall never showed up.

At 5:30 AM, Pauley drafted a report. *See id.*, Ex. 1. He explained Mr. Hall struck Mrs. Hall multiple times in the head, threw open-handed and close-handed strikes, and lobbed her into a wall. *See id.* Physical marks corroborated these allegations. *See id.* After smashing his daughter's cellphone, Mr. Hall unplugged the Wi-Fi router and cellular booster. *See id.* Pauley then filed two counts of domestic battery and one count of interfering with emergency communications against Mr. Hall. *See id.*; Ex. 3 at 1. Pauley then e-mailed a copy of his report to the Putnam County Sheriff Department's Domestic Violence/Sexual Assault Officer—Defendant Heather Grimmett. *See* Grimmett Dep. 12:5–13:4. No one reported child abuse or neglect to Child Protective Services. *See* Miller Dep. 21:16–22:5, ECF No. 140-17.

Grimmett reviewed Pauley's report. *See* Grimmett Dep. 14:17–15:5. On November 4, 2021, she attempted contact with Mrs. Hall without success. *See id.* at 13:5–11. The next day, she called again. *See id.* at 15:6–7. This time, Mrs. Hall responded. During their conversation, Mrs. Hall explained she would not cooperate with the criminal investigation against her husband, stressed Mr. Hall had been staying elsewhere since the incident, and refused to obtain a Domestic Violence Protective Order. *See id.* at 15:8–16:2. *See also* A. Hall Dep. 106:21–107:8. Critically, Mrs. Hall informed Grimmett she was "very p*ssed" about the police's behavior. *See* Grimmett Mot., Ex. 6 at 3, ECF No. 138-6. She claimed she did not "see or know [where] her girls were for two hours" and "felt pressure" to give a statement. *Id.* Officers stopped recording twice because she was not saying the "correct thing" they "wanted to hear." *Id.* at 3–4. Officers told her she would "get in trouble for not cooperating." *Id.* at 4.

Grimmett memorialized part of this conversation in an official Supplemental Report. *See id.*, Ex. 1 at 2. The Report notes Mrs. Hall's reluctance to cooperate. *See id.* It does not record Mrs. Hall's allegations of police misconduct. *See id.* Grimmett told Pauley and Martin she "didn't put" these additional allegations in the Report. *Id.*, Ex. 6 at 3. *See also* Grimmett Dep. 18:12– 19:3. Grimmett did not report child abuse or neglect to Child Protective Services. *See id.* 14:12–14.

On November 8, 2021, the Putnam County Prosecutor's Office filed criminal charges against Mr. Hall for domestic battery and interfering with a 911 call. *See* Pls.' Liability Mot., Ex. 25, ECF No. 151-25. No one reported child abuse or neglect to Child Protective Services. *See id.*

On December 19, 2021, Mrs. Hall filed a formal grievance against the Putnam County Sheriff's Department. *See* Grimmett Mot., Ex. 7, ECF No. 138-7. In the grievance, Mrs. Hall alleges officers held her children "hostage" at an "undisclosed location" until she gave a statement and cooperated. *Id.* They interrogated her for "almost two hours" and recorded her "multiple times"—starting "all over again" whenever they were not "happy" with her statement. *Id.* Officers "kept bringing up" a prior domestic violence incident between Mr. and Mrs. Hall—leaving her "very confused" as to what "[she] was answering to." *Id.* She alleged officers "completely fabricated their own version of the incident and straight up lied." *Id.*

On December 22, 2021, Mrs. Hall met with Putnam County Prosecutor Kevin Lawson and Domestic Violence Victim Advocate Marian Smith. *See* A. Hall Dep. 123:18–131:22. Mrs. Hall tried to get her husband's criminal charges dropped, stated she would not cooperate with the prosecution, and repeated the substance of her grievance. *See id.* at 125:1–20, 126:7–127:19. Lawson called Mrs. Hall "meek" and sided with his officers. *Id.* at 125:6–20. He stated Mrs. Hall would "play by the [prosecutor's] rules" and threatened to "get CPS involved." *Id.* at 125:16–18. Yelling ensued. *See id.* at 127:20–22. Mrs. Hall left. *See id.*

-6-

On January 6, 2022, Derek Miller opened an internal investigation into Mrs. Hall's grievance. *See* Grimmett Mot., Ex. 9. His investigation unfolded in three parts. *First*, Miller reviewed the November 3rd report—including statements of Mrs. Hall and her two children, photographs of an unplugged Wi-Fi router, and the criminal complaint and warrant against Mr. Hall. *See id.* He also reviewed Grimmett's Supplemental Report. *See id.* He noted her report contained "[n]o allegations of misconduct." *Id. Second*, Miller spoke with Smith who informed him Mrs. Hall attempted to get Lawson to drop the criminal charges against her husband. *See id.* According to Smith, Lawson was "thinking of the rights and safety of the juvenile victims and CPS has been contacted." *Id. Finally*, Miller separately interviewed Pauley, Hudson, and Martin. *See id.* He did not interview Grimmett. *See* Grimmett Dep. 27:21–28:8.

On January 10, 2022, Miller concluded Mrs. Hall's allegations were "unfounded." Grimmett Mot., Ex. 9. He informed Pauley, Hudson, and Martin of his findings. *See id.* at 24:19–21. He then instructed Pauley to make a child abuse and neglect referral against Mr. Hall. *See id.* at 24:10–16. Two days later, Pauley referred Mr. Hall to Child Protective Services for suspected abuse and neglect. *See* Miller Dep. 25:3–26:22; Pauley Dep. 60:12–19. CPS Agent Seth Greensage oversaw the referral. *See* Greensage Dep. 11:18–20, ECF No. 138-17.

Around this time, preparation for Mr. Hall's criminal trial began. Progress soon stalled because Mrs. Hall refused to accept subpoenas requiring her to testify at the trial. *See, e.g.*, Grimmett Dep. 48:22–49:8. On January 19, 2022, the process server failed to serve Mrs. Hall. *See* Grimmett Mot., Ex. 11 at 2. The process server left a notice with contact information on her front door, but no one ever called. *See id.* Frustrated, the prosecutor's office asked Grimmett for assistance. *See* Grimmett Dep. 48:22–49:8. On February 9, 2022, she visited the Hall's residence. *See* Grimmett Mot. at 10. Grimmett claims she could hear footsteps in the house, but no one

answered the front door. *See id.* Grimmett contacted the prosecutor's office for guidance. *See* Pls.'
Liability Mot., Ex. M, ECF No. 151-14. They requested she write a report stating she could not
attempt service. *See id.* On March 24, 2022, the process server failed to make service a third time.
*See* Grimmett Mot., Ex. 12 at 4, ECF No. 138-12.

Throughout this period, CPS Agent Seth Greensage struggled to complete his CPS
investigation. *See* Greensage Dep. 15:13–16. Whenever Greensage visited the Hall residence,
"nobody would answer the door." *Id.* at 15:13–14.. *See id.* Concerned, the prosecutor's office
informed Grimmett they were having a "hard time" contacting Greensage. Grimmett Dep. 56:20.
On March 29, 2022, Grimmett e-mailed him for an update. *See* Grimmett Mot., Ex. 6 at 2.
Greensage called her back. *See* Grimmett Dep. 59:13. He told Grimmett about his failed contact
attempts. *See id.* at 59:15–21; Greensage Dep. 17:14–19. At some point, Grimmett expressed
similar concerns to Greensage, *see id.*, mentioned unserved subpoenas to him, *see id.* at 18:24–
19:3, and revealed they were "trying to track down" a firearm Mr. Hall owned, *id.* at 18:20.

In early April, the prosecutor's office "ordered" Grimmett to obtain a search warrant for
the Hall residence, Grimmett Dep. 61:4, because nobody "had laid eyes on [the two minor children]
since January," *id.* at 60:17. On April 4, 2022, Grimmett filed an Affidavit & Complaint for Search
Warrant before a Putnam County magistrate. *See* Grimmett Mot., Ex. 11, ECF No. 138-11.

The Affidavit Supporting Probable Cause includes eight paragraphs. Paragraph 1
summarizes the Hall's November 3, 2021 dispute—including Mr. Hall's threats with a pistol. *See
id.* at 7. Paragraph 2 states Mr. Hall has a 2007 felony conviction for wanton endangerment with
a firearm. *See id.* Paragraph 3 summarizes Grimmett's conversation with Mrs. Hall on November
5, 2021. *See id.* Grimmett explains Mrs. Hall "would not participate" in the criminal investigation
against Mr. Hall. *See id.* Paragraph 4 recounts Mrs. Hall's December 22, 2021 meeting with the

Putnam County Prosecutor's Office—including Mrs. Hall's "numerous complaints" about her husband's criminal investigation. *See id.* Paragraph 5 describes Greensage's difficulties contacting the children to conduct forensic interviews. *See id.* Paragraphs 6 and 7 discuss the failed service attempts on January 19, 2022 and February 9, 2022. *See id.*

Paragraph 8 requests a search warrant to "ensure the safety of the two female juveniles." *Id.* at 3. Grimmett reiterates Mr. Hall illegally possessed a firearm; explains his "domestic violence charges must be answered to in court; however, Mrs. Hall is refusing service of subpoenas for herself and for the two juvenile females;" and notes Mrs. Hall has been "uncooperative" with Greensage's investigation. *Id.* A magistrate approved the search warrant. *See id.* at 1.

On April 6, 2022, Heather Grimmett, Defendant J.B. Grimmett and J.T. Vieth executed the search warrant. *See* Pls.' Liability Mot., Ex. R, ECF No. 151-19. While the officers searched the premises, the Halls were required to sit on their living room couch. *See generally* Pls.' Mot., Ex. S.II, ECF No. 151-21 (video recordings of search warrant).

At some point, the officers served Mrs. Hall subpoenas for Mr. Hall's criminal trial. *See* Grimmett Dep. 64:18–19; Pls.' Mot., Ex. 21 at 2:40–2:43 (video recording #1 of search warrant) (Mrs. Hall: "I guess it's one way to serve up a subpoena"). At another point, J.B. Grimmett tells Mrs. Hall: "You've done nothing but be smart alecks since we've been here." *Id.* at 1:02–1:07. Mrs. Hall then asks "what happened to [her] internal affairs complaint." *Id.* at 1:26–1:30. Heather Grimmett responds: "I have no idea." *Id.* at 1:39–1:41. J.B. Grimmett adds: "We don't handle [internal affairs]." *Id.* Both parties raised their voices and stated they did not trust the other. *See id.*, Ex. 21 at 0:00–0:25 (video recording #2 of search warrant). J.B. Grimmett and Mrs. Hall then discuss the November 3, 2021 incident; Mrs. Hall maintains three, separate recordings were made, she "felt" pressured to say certain things, and her children were kept from her. *See id.* at 0:25–

2:05. In her Property Receipt, Heather Grimmett explains no weapons were found on the property. *See* Pls.' Mot., Ex. R at 2, ECF No. 151-19. She makes no reference to the children. *See id.*

In mid-April, the prosecutor's office decided to file abuse and neglect proceedings against the Halls in Putnam County Circuit Court. *See* Grimmett Dep. 82:7–9. The prosecutor's office requested Grimmett write the narrative portion of the Petition to Institute Child Abuse & Neglect Proceedings. *See id.* at 83:1–5. She wrote Paragraphs 6a through 6n of the Petition. *See id.* at 88:23–13. These paragraphs summarize: (1) the November 3, 2021 incident; (2) Grimmett's conversation with Mrs. Hall on November 5, 2021; (3) Pauley's CPS referral on January 12, 2022; (4) Greensage's difficulties in conducting the CPS investigation; (5) failed service attempts on January 19, 2022; February 9, 2022; and March 24, 2022; and (6) the search of the Hall residence and service of subpoenas on April 6, 2022. *See* Grimmett Mot., Ex. 12 at 2–5, ECF No. 138-12. Grimmett finished her "portion" of the Petition by the "end of April, very beginning of May." Grimmett Dep. 83:8. She submitted her draft to the prosecutor's office. *See id.* at 83:9–23.

On May 9, 2022, Mr. Hall was convicted of two counts of domestic battery. *See* Grimmett Mot., Ex. 12 at 5. Mrs. Hall and her children provided testimony. *See id.* The same day, Grimmett reached out to the prosecutor's office to check the status of the Petition. *See* Grimmett Dep. at 83:9–10. They responded the Petition was not ready yet. *See id.* at 83:22.

On May 23, 2022, Greensage concluded Mr. Hall did not abuse or neglect his children. *See* Pls.' Liability Mot., Ex. L at 2, ECF No. 21. Greensage maintains he told Grimmett the results of the investigation "within about a week, at least a week." Greensage Dep. 33:17–19. Grimmett denies this allegation. *See* Grimmett Dep. 89:14–21.

On May 31, 2022, Mr. Hall received a two-year suspended sentence for his domestic battery convictions. *See* Grimmett's Mot., Ex. 3 at 6–7, ECF No. 138-3. Nine days later, Grimmett

-10-

filed a Petition to Institute Child Abuse & Neglect Proceedings in Putnam County Circuit Court. *See id.*, Ex. 12. Plaintiffs filed suit. *See generally* Compl., ECF No. 1.

## LEGAL STANDARD

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if a "reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

In its analysis, the Court does not resolve disputed facts, weigh the evidence, or make determinations of credibility. *See Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Instead, the Court draws all permissible inferences from the facts in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Still, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ANALYSIS

Plaintiffs assert five causes of action. They are: § 1983 (Count I); *Monell* (Count II); Abuse of Process (Count III); Intentional Infliction of Emotional Distress (Count IV); and Spoliation of Evidence (Count V). *See* Am. Compl. ¶¶ 47–79, ECF No. 30. Plaintiffs request summary judgment on Counts I and II. *See* Pls.' Liability Mot.; Pls.' *Monell* Mot. Defendants request summary judgment on all counts. *See* Pauley Mot.; Grimmett Mot. The Court considers each in turn.

## I

In Count I, Plaintiffs allege Defendants violated their First and Fourth Amendment rights. *See* Am. Compl. ¶ 47. The Court considers each type of violation in turn.[4]

## A

The Court begins with Plaintiffs' First Amendment retaliation claims. The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for their protected speech. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006). Plaintiffs allege Defendants retaliated against them by (1) instigating a Child Protective Services investigation; (2) obtaining a search warrant; and (3) filing a Petition to Institute Child Abuse & Neglect Petition in state court. *See* Am. Compl. ¶ 53. None of these claims succeed.[5]

## 1

Mrs. Hall first argues Pauley filed a Child Protective Services investigation request in retaliation for her formal complaint alleging police misconduct. *See* Pls.' Liability Mem. at 12; Am. Compl. ¶ 53(a). Both Mrs. Hall and Pauley move for summary judgment. *See* Pls.' Liability

---

[4] Plaintiffs allege their "rights under the Fourteenth Amendment also prohibit the Defendants from exercising excessive force in the performance of their duties." Am. Compl. ¶ 70. The Court dismissed this same single-paragraph allegation at the motion to dismiss stage because Plaintiffs failed to "give the elements of the offense, let alone plausibly allege factual content to support those elements." *Hall v. Putnam Cnty. Commission*, 637 F. Supp. 3d 381, 396 (S.D. W. Va. 2022). Despite this admonition, Plaintiffs did not pursue this claim during discovery or in their summary judgment briefing. As a result, the Court **GRANTS** Defendants summary judgment on this claim. *See Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 ("District courts have an inherent power to grant summary judgment sua sponte so long as the party against whom summary judgment is entered has notice 'sufficient to provide [it] with an adequate opportunity to demonstrate a genuine issue of material fact.'") (quotation omitted).

[5] Mrs. Hall raises another instance of retaliation in their Partial Motion for Summary Judgment on Liability. *See* Pls.' Mot. for Liability at 11–12. She claims Defendants retaliated against her for refusing to "alter her narrative" on November 3, 2021 to fulfill Defendants' "demands for a specific statement of untrue facts" *Id.* at 11. However, this claim is not in Plaintiffs' initial or amended complaint. *Compare Hall*, 637 F. Supp. 3d at 390–93 (discussing only the CPS referral, search warrant, and abuse petition) *with* Am. Compl. ¶ 53 (listing the same CPS referral, search warrant, and abuse petition as bases for relief). A plaintiff may not raise claims in a motion for summary judgment not alleged in its complaint. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (explaining a "plaintiff may not raise new claims" for the first time at summary judgment "without amending his complaint"); *GMC Real Estate, LLC v. Amguard Ins. Co.*, 2023 WL 4748247, at *4 n.5 (S.D. W. Va. July 25, 2023) (same). As such, the Court disregards these allegations.

Mem.. at 12–18; Pauley Mem. at 12–14. The Court finds Pauley entitled to qualified immunity because no caselaw "reflect[s] the circumstances" presented in this case. *Id.* at 13.

Qualified immunity is potent. It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It provides officials "breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). An official is entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right and (2) that right was clearly established at the time of its violation. *See Owens v. Baltimore City State's Attorneys' Office*, 767 F.3d 379, 395 (4th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts can "skip ahead" to the "clearly established" prong, *Brown v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017), to better "facilitate the fair and efficient disposition of each case," *Pearson*, 555 U.S. at 242. The Court takes this invitation.

The clearly established analysis unfolds in two parts. *First*, a court must "define the right at issue with specificity," *Knibbs v. Momphard*, 30 F.4th 200, 223 (4th Cir. 2022), not at "high level of generality," *see Garrett v. Clarke*, 74 F.4th 579, 588 (4th Cir. 2023) (quotation omitted). In other words, the "contours" of the right, *id.* at 584, must be defined within the "specific context of the case," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). *Next*, the Court must determine whether the right was "sufficiently clear that every reasonable official would understand what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Decisions of the Supreme Court, the Fourth Circuit Court of Appeals, and the West Virginia Court of Appeals must place the constitutional right beyond debate. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. 2013). These decisions must be "particularized" to the facts of the case. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Mrs. Hall stresses she has a constitutional right to file a complaint about police action and a right to be free from retaliation because of such a complaint. *See* Pls.' Resp. to Pauley Mot. at 12–13. No doubt. Citizens have a "right to voice dissent from government policies." *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013). *See also Bradley v. Computer Sciences Corp.*, 643 F.2d 1029, 1033 (4th Cir. 1981) (explaining the ability to present complaints to government officials about the conduct of their subordinates is central to the right to petition for a redress of grievances). But this characterization is too broad. It is not tied to the "specific context" of this case: a retaliatory child protective services investigation initiated by a police officer after an individual files a complaint alleging police misconduct. *Brosseau*, 543 U.S. at 198.

Whether a standard retaliatory investigation claim is a viable constitutional tort—let alone a retaliatory initiation of an investigation claim—remains undecided. The Supreme Court provides no guidance. *See Hartman*, 547 U.S. 250 at 262 n.6 (reserving the question whether "the expense or other adverse consequences of a retaliatory investigation" justifies recognizing "such an investigation as a distinct constitutional violation").

Circuit courts split. Some reject retaliatory investigation claims altogether; others stress the law surrounding them remains murky. *See Villarreal v. City of Laredo, Tex.*, 2024 WL 244359, at*14 (5th Cir. Jan. 23, 2024) ("Nor does [Plaintiff] have an actionable retaliatory investigation claim, because this court does not recognize such a claim.") (citation omitted); *J.T.H. v. Mo. Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("It is safe to say . . . the law [of retaliatory investigations] is anything but clear."); *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) ("The Supreme Court has declined to consider whether a retaliatory criminal investigation entails a constitutional violation. Other circuits disagree with one another on the issue."); *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) ("There is no clearly established rule of law under

which an official pursuing a lawful investigation, based on probable cause, has been found liable under the First Amendment to a target."); *Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010) (noting the "[t]he Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort, and neither has this Court" and holding the "right to be free from a retaliatory investigation is not clearly established"). The Fourth Circuit is silent on the issue.[6]

District courts across the circuit reject retaliatory investigation claims—at least when the "plaintiff exercises free speech then law enforcement starts an investigation as punishment[] or to lead to criminal charges that will serve as punishment." *Nazario v. Guiterrez*, 2022 WL 319831, at *5 (E.D. Va. Feb. 2, 2022). *See also Pidanick v. LaRosa*, 2019 WL 10894089, at *8 (D.S.C. Mar. 5, 2019) (holding a retaliatory investigation claim "cannot support a § 1983 claim"); *Nance v. Ingram*, 2015 WL 5719590, at *8 (E.D.N.C. Sept. 25, 2019) ("[T]here is no clearly established right not to be the subject of a retaliatory investigation."). Mrs. Hall's retaliatory claim fits this "distinct pattern." *Nazario*, 2022 WL 319831 at *5. She filed her grievance, then Pauley retaliated by requesting a child protective services investigation. *See* Pls.' Resp. to Pauley Mot. at 13.

---

[6] At oral argument, Plaintiffs cited *Snoeyenbos v. Curtis*, 60 F.4th 723 (4th Cir. 2023), for support. There, Rebecca Snoeyenbos asserted a "First Amendment 'retaliatory inducement' theory" against Deputy Sheriff Marcia Curtis. 60 F.4th at 727. Years prior to her lawsuit, Deputy Curtis cited Snoeyenbos for a parking violation. *See id.* at 726. Snoeyenbos complained about the incident on social media. *See id.* Years later, Deputy Sheriff Jaime Riley pulled over Snoeyenbos. *See id.* Riley reported the incident over the police radio. *See id.* Deputy Curtis heard about the encounter and offered to buy Riley lunch if he cited Snoeyenbos. *See id.* Riley complied. *See id.* Snoeyenbos sued alleging retaliatory inducement. *See id.* The Fourth Circuit affirmed a jury verdict for the officer. *See id.* at 734.
    This "curious" case sheds little light on the Halls' theory of retaliation. *Id.* at 727 n.1. Factually, the Halls do not allege—or prove—anyone promised Pauley any reward for filing the CPS referral. *See id.* at 727. In fact, Miller chastised Pauley for *not* filing the CPS referral within twenty-four hours of the November 3, 2021 incident. *See* Miller Dep. at 25:1–27:16. Legally, the Fourth Circuit reserved the question whether to extend a no-probable cause requirement to "retaliatory inducement theory" cases. *See Snoeyenbos*, 60 F.4th at 727–28 n.1 (looking for "any daylight" between a retaliatory arrest or prosecution case and Snoeyenbos' claims). This hesitancy emphasizes the murky waters surrounding novel retaliatory inducement claims. Critically, the Court upheld a not liable verdict for Deputy Curtis. *See id.* at 729. Reliance on *Snoeyenbos* is, therefore, misplaced. *See Aleman v. City of Charlotte*, 80 F.4th 264, 300 (4th Cir. 2023) (characterizing the use of "cases in which there was no constitutional violation at all to show that an officer violated clearly established" law as a "fraught endeavor").

In *Stewart v. Justice*, this Court recognized this uncertainty. *See* 518 F. Supp. 3d 911, 920 (S.D. W. Va. 2021). Summarizing lower court caselaw after *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the Court stressed the rules governing claims of government retaliation through civil or regulatory action remain in flux. *See id.* (highlighting developments in two circuits). This Court reaffirmed this position in its motion to dismiss ruling. There, the Court explained "[s]ome circuits have extended retaliatory arrest and prosecution caselaw to "claims of government retaliation through civil actions." *Hall*, 637 F. Supp. 3d at 392. The Court then cited caselaw from the Eleventh Circuit and several district courts. *See id.* Neither type of decision establishes clearly established law in this circuit. *See Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 683 (4th Cir. 2023) (looking for "cases of controlling authority" in the Fourth Circuit or "consensus of persuasive authority from other jurisdiction" to find a right "clearly established").

Given the uncertainty about the vitality of a retaliatory investigation claim in general—let alone its application to the facts of this case—the Court concludes qualified immunity shields Pauley. *See White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (requiring a "case where an officer acting under similar circumstances . . . was held to have violated the" Constitution).

Accordingly, the Court **DENIES** Plaintiffs summary judgment and **GRANTS** Defendants summary judgment on this claim.

**2**

Mrs. Hall presses on. She argues Grimmett procured and executed a search warrant in retaliation for her formal complaint alleging police misconduct. *See* Am. Compl. ¶ 53(b). Grimmett requests summary judgment. *See* Grimmett Mem. at 11–12. The Court holds Mrs. Hall's claims are barred because probable cause supported Grimmett's search warrant.

In some ways, retaliatory search warrant claims resemble "ordinary" retaliation claims. *Hartman*, 547 U.S. at 259. Both allege the government official "harboring the animus" is the same individual "taking the adverse action." *Id.* Both require the plaintiff to establish a "causal connection" between the government official's "retaliatory animus" and the plaintiff's "subsequent injury." *Id.* at 259. In other words, both require the plaintiff prove the adverse action would not have been taken absent the retaliatory motive. *See id.* at 260.

Despite these similarities, retaliatory search warrant claims differ meaningfully from their ordinary counterparts. Behind every valid search warrant is probable cause. *See* U.S. Const. amend. IV; *Fernandez v. California*, 571 U.S. 292, 298 (2014) ("The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not be issued without probable cause."). Probable cause provides a "distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation." *Hartman*, 547 U.S. at 261. The lack of probable cause helps "reinforce the retaliation evidence and show that retaliation was the but-for basis" of the search. *Id.* On the flip side, a showing of probable cause suggests the search "would have occurred even without a retaliatory motive." *Id.* In short, the absence of probable cause provides "weighty evidence" the officer's animus caused the search; its presence suggests the opposite. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).

Recognizing the "high probative force" of probable cause, the Supreme Court has held retaliatory prosecution and retaliatory arrest cases require proving the retaliatory conduct lacked probable cause. *See Bartlett*, 547 U.S. at 266; *Nieves*, 139 S. Ct. at 1725. Retaliatory search warrant cases should too. When a plaintiff alleges an officer unlawfully searched their home, the question of probable cause "looms large." *Bartlett*, 547 U.S. at 265. Its existence carries "obvious," *id.*, "powerful evidentiary significance" to the causation inquiry, *id.* at 261. Because the existence of

-17-

probable cause arises in "practically all" retaliatory search warrant cases, has "high probative force," and "can be made mandatory with little or no added cost" to litigants, it makes sense to require plaintiffs to prove lack of probable cause in retaliatory search warrant claims. *Id.* at 265.

The Court is not alone in its decision. *See Meade v. Smith*, 2020 WL 1180410, at *11 (N.D. Iowa Mar. 11, 2020) (suggesting a plaintiff must prove no probable cause when they allege the "search warrant itself" was retaliatory); *Johnson v. City of Atwater*, 2019 WL 2493271, at *9 (E.D. Cal. June 14, 2019) (applying *Nieves* to retaliatory search warrant claim); *Fredin v. Clysdale*, 2018 WL 7020186, at *7 (D. Minn. Dec. 20, 2018) (applying *Hartman* to similar claim).[7]

Applying this rule here, Mrs. Hall's retaliatory search warrant claim fails. Probable cause exists for a search warrant if there is a "fair probability" contraband or evidence of a crime will be found in a place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The "totality of circumstances" and "common-sense conclusions about human behavior" inform the analysis. *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020). Notably, when a "neutral and detached magistrate" previously finds probable cause, a court reviews that determination with "great deference." *Illinois*, 462 U.S. at 236. The Court does not conduct a "*de novo* determination of probable cause." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam). Instead, the Court determines whether there is "substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Id.* The Court cannot invalidate warrants by interpreting them in a "hypertechnical, rather than a commonsense, manner." *United States v. Blackwood*, 913 F.3d 139, 142 (4th Cir. 1990).

---

[7] To be sure, neither *Hartman* nor this Court believes a showing of probable cause forecloses all First Amendment retaliation claims. *Hartman* expressly states showing probable cause "is not necessarily dispositive." 547 U.S. at 265. Probable cause does not "guarantee" retaliation was "not the but-for fact in a prosecutor's decision." *Id.* Instead, an official's "disclosure of retaliatory thinking" and evidence the official was "nothing but a rubber stamp" for other government actors is of "great significance" to the ultimate causation inquiry. *Id.* at 264. So is "objective evidence" the plaintiff suffered under government action while others who acted similarly did not. *Nieves*, 139 S. Ct. at 1727. This case does not fit any of these "rare" molds. *Bartlett*, 547 U.S. at 265.

Here, a magistrate approved a search warrant to search for "any and all firearms[] described in the 911 call and in two written statements as a 'gun' and a 'pistol.'" Grimmett Mot., Ex. 11, ECF No. 138-11. The supporting affidavit explains Mr. Hall is a convicted felon unable to "legally possess a firearm." *Id.* at 2. Despite this prohibition, a 911 call on November 3, 2021 revealed Mr. Hall made "threats with a gun." *Id.* Both Mr. Hall's children "gave written statements that their father said to get him the pistol and the get the gun out [of the house]." *Id.* When police arrived, they could not find Mr. Hall or the gun. *See id.* Collectively, this information provides "substantial evidence" to support a search warrant. *See United States v. Orozco*, 41 F.4th 403, 411 n.9 (4th Cir. 2022) ("A magistrate judge could reasonably believe that searching the home might uncover the gun" because "there are places so intrinsically part of a person's daily life that would expect evidence of their crimes to be found there.") (citing sources).

Mrs. Hall disagrees. She launches three attacks. None prevail. *First*, Mrs. Hall argues the months-long delay was "patently unreasonable." Pls.' Mem. Liability at 18–19. A valid search warrant "may issue only upon allegations of facts so closely related to the time of the warrant as to justify a finding of probable cause at that time." *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984). The government may not rely on information "too old to furnish present probable cause." *Id.* Yet "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (same). In fact, staleness is "much less of a concern," *United States v. Njokem*, 2022 WL 1705172, at *1 (D. Md. Nov. 22, 2022), when the alleged criminal activity is "ongoing in nature," or "the evidence sought [is] intrinsically likely to remain at the location where it was originally observed," *McCall*, 740 F.2d at 1335.

Both situations are present here. Mr. Hall's alleged criminal activity—a felon in possession of a firearm—was "ongoing" when the magistrate approved the search warrant. The affidavit presents no evidence Mr. Hall relinquished his firearm. Moreover, people who possess firearms tend to keep evidence of that possession in their homes "for a long time." *United States v. Hodges*, 2018 WL 934616, at *4 (S.D. W. Va. Feb. 16, 2018) (Chambers, J.) (surveying caselaw).

*Second*, Mrs. Hall argues the warrant relies on inaccurate statements about Mrs. Hall's communications with the ongoing CPS investigation. *See* Pls.' Mem. Liability at 20 – 21 (detailing alleged inaccuracies). Admittedly, the record is fuzzy as to how congenial the relationship between Mrs. Hall and Greensage was during the CPS investigation. *Compare* Greensage Dep. 15:9–16 (describing difficulties contacting the Halls) *with id.* at 41:15–18 (stating communications improved when the Halls retained counsel). But this debate does not change the probable cause analysis. Even if these "tainted" statements were "excised" from the affidavit, the remaining factual allegations support probable cause for a search warrant. *United States v. Wilson*, 995 F. Supp. 2d 455, 479 (W.D.N.C. 2014). Indeed, the remaining statements paint a bleak picture. A convicted felon allegedly with a gun ignited a domestic dispute with two children present. "Firearms and domestic strife are a potentially deadly combination." *United States v. Hayes*, 555 U.S. 415, 427 (2009). "All too often the only difference between a battered woman and a dead woman is the presence of a gun." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (brackets and citation omitted). The affidavit speaks to these fears—with or without the CPS statements.

*Finally*, Mrs. Hall argues the search warrant has "issues with scope" because the warrant only requested to search the home even though Grimmett knew Mrs. Hall left the pistol in her automobile in the garage. Pls.' Mem. Liability at 22. She cites her deposition for support. *See id*. There, Mrs. Hall states "[t]he gun was in [her] car at the time [of the incident] in the garage." A.

Hall Dep. 71:6–7. She does not state whether Grimmett knew this information when she sought the search warrant. Even if Grimmett knew this information, several sources contradicted it. Both written statements and the 911 call placed the firearm inside the Hall residence during the domestic dispute. *See, e.g.*, Pauley Mot., Ex. 3 at 4 ("Caller advised the teenage girls had been fighting with their dad[;] he was making threats with a gun and had hit the mother and one of the children."); Ex. 6 at 2 (confirming Mr. Hall was "making threats with a gun"); Ex. 8 ("My dad was telling my mom to get her gun out."); Ex. 9 ("[M]y dad made [Mrs. Hall] come upstairs by dragging her by the arm and told her to get him the pistol."). Besides, firearms can be kept in multiple places. An officer may make a reasoned decision supported by probable cause to search one place over another. *See Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993) (explaining officers have "leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension [] every mistaken search and seizure will present a triable issue of probable cause").

In sum, because probable cause supported the search warrant, Mrs. Hall's First Amendment retaliation claim fails as a matter of law. Accordingly, the Court **DENIES** summary judgment to Plaintiffs and **GRANTS** summary judgment to Defendants on this claim.

**3**

Mrs. Hall makes one last pitch. She alleges Grimmett filed a Petition to Institute Child Abuse & Neglect Proceedings against her in retaliation for her formal complaint alleging police misconduct. *See* Pls.' Mem. Liability at 23–25. Both Mrs. Hall and Grimmett request summary judgment. *See id.*; Grimmett Mem. at 12–15. Grimmett asserts qualified immunity. *See id.* 15. The Court concludes Mrs. Hall fails to establish a violation of a constitutional right.

Child abuse and neglect proceedings are civil proceedings. *See, e.g.*, *In re J.S.*, 758 S.E.2d 747, 757 (W. Va. 2014) (holding the Sixth Amendment's Confrontation Clause does not apply in

-21-

child abuse and neglect hearings because they are "civil rather than criminal action[s]"); *Matter of Taylor B.*, 491 S.E.2d 607, 613 (W. Va. 1997) ("[C]ivil abuse and neglect proceedings focus directly upon the safety and well-being of the child and are not simply 'companion cases' to criminal prosecutions."). *Cf. State ex rel. L.D. v. Cohee*, 885 S.E.2d 633, 640 (W. Va. 2022) (explaining abuse and neglect proceedings are "first and foremost" "remedial in nature").

Courts disagree as to whether probable cause defeats a claim alleging a retaliatory civil action. *Compare Demartini v. Town of Gulf Stream*, 942 F.3d 1227, 1303 (11th Cir. 2019) (applying *Nieves*'s no probable cause requirement to retaliatory civil RICO action); *Cappy v. Cty. of San Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019) (finding *Nieves* instructive in suit alleging social worker retaliated against a father by coercing the mother to file an ex parte custody application) *with Stewart v. Justice*, 518 F. Supp. 3d 911, 920 (S.D. W. Va. 2021) (applying the "typical First Amendment retaliation standard" because "the Fourth Circuit has not yet extended *Nieves* beyond retaliatory arrest and prosecution claims").

The Court need not resolve this debate because Mrs. Hall's claim fails under either standard. Start with the "typical" retaliation standard. *Stewart*, 518 F. Supp. 3d at 920. Under this standard, the plaintiff must demonstrate: (1) their speech was protected; (2) the defendant's allegedly retaliatory action adversely affected the plaintiff's constitutional protected speech; and (3) a causal relationship exists between its speech and the defendant's retaliatory action. *See, e.g.*, *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000) (citations omitted).

Mrs. Hall clears the first two hurdles. A complaint filed with a police department alleging police misconduct is protected speech. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Tobey*, 706 F.3d at 391 ("A bedrock First Amendment principle is that citizens

have a right to voice dissent from government policies.") (citation omitted). Furthermore, initiating abuse and neglect proceedings in retaliation for filing a complaint could plausibly chill a reasonable person from complaining about police conduct. *See Smith v. Frye*, 488 F.3d 263, 272 (4th Cir. 2007) (looking to see if the allegedly retaliatory conduct would "likely deter 'a person of ordinary firmness'" from exercising their First Amendment rights) (citation omitted).

Mrs. Hall stumbles at the third hurdle—causation. Causation in retaliatory cases is "but-for causation." *Hartman*, 547 U.S. at 260. That is, "upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate [they] would have taken the action complained of." *Id.* In other words, there is no unlawful retaliation if the defendant can prove "the same decision would have been reached" absent the protected speech. *Mt. Healthy Cty. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977). In short, "[i]t may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken any way." *Hartman*, 547 U.S. at 260 (citations omitted).

Defendants satisfy this burden. They point to Mr. Hall's two criminal convictions for domestic violence. *See* Grimmett Mem. at 14–15 (suggesting Mrs. Hall concedes her cooperation in the criminal trial "reflects whether or not the children are with a safe parent") (quoting A. Hall Dep. at 118:13–22). Acts of domestic violence are considered in determining the fitness of a parent. *See In re Stephen Tyler R.*, 584 S.E.2d 581, 593–94 (W. Va. 2003) (surveying cases). Domestic violence in the "presence of children may constitute child abuse." *Mary Ann P. v. William R.P., Jr.*, 475 S.E.2d 1, 6 n.4 (W. Va. 1996) (citation omitted). Even assuming retaliatory intent played "some role" in Grimmett's decision to file the abuse and neglect petition, Mr. Hall's two domestic violence convictions constitute independent, legitimate grounds for her decision. *Stewart*, 518 F.

Supp. 3d at 921. As such, her retaliatory civil action claim fails. *See id.* (denying First Amendment retaliation claim when allegedly retaliatory conduct was "motivated not by animus, but by an obligation to enforce the law and promote public safety").

Mrs. Hall fares no better under a "no probable cause" standard. Under W. Va. Code § 49-4-601, a "reputable person" may file an abuse and neglect petition if they "believe[] that a child is neglected or abused." Relevant here, an abused child is (1) one "whose health or welfare is threatened by . . . [d]omestic violence," W. Va. Code § 49-1-201(1), *or* (2) one who lives with a parent who "knowingly allows another person to inflict" the abuse "upon the child or another child in the home," *id.* § 49-1-201(1)(A). Putting these provisions together, probable cause exists when facts and circumstances known to the "reputable person" suggest a parent of a child "has committed, is committing, or is about to commit" child abuse and neglect. *Ross v. Early*, 746 F.3d 546, 561 (4th Cir. 2014) (quoting *Michigan v. DeFillippo*, 4434 U.S. 31, 37 (1979)). Importantly, the Court looks to the evidence before the official at the time abuse and neglect petition was filed. *See Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016).

The evidence before Grimmett at the time she filed the abuse and neglect petition satisfies this standard. By June 2022, several pieces of evidence suggested Mr. Hall committed child abuse and neglect. The 911 call from November 3, 2021 depicts Mr. Hall making threats with a gun against his family. *See See* Pauley Mot., Ex. 5 at 2. Two statements from his children corroborate these threats. *See id.*, Exs. 8, 9. Mrs. Hall's recorded statements suggest Mr. Hall smashed his daughter's cell phone in anger. *See id.*, Ex. 7 at 1:16–1:22. A Dangerous-Lethality Information Form suggested Mr. Hall's violent behavior occurred in the past and "increased" in the past few months. *See* Pls.' Liability Mot., Ex. D at 2. Moreover, on May 9, 2022, Mr. Hall was convicted of two counts of domestic violence—one count against Mrs. Hall and one count against his

daughter. *See* Grimmett Mot. Ex. 3 at 6–7. On May 31, 2022, Mr. Hall received a two-year suspended sentence for the counts. *See id.* at 9–12. Taken together, Grimmett could reasonably believe Mr. Hall committed child abuse and neglect under West Virginia law.

In addition, for months, Mrs. Hall dodged service and refused to cooperate with authorities. This behavior suggests she knew of Mr. Hall's violent actions on November 3, 2021 yet took "no action in the face of [this knowledge]." *In re Lilith H.*, 7445 S.E.2d 280, 288 (W. Va. 2013) (citation omitted). Grimmett could, therefore, reasonably suspect Mrs. Hall was "aid[ing] or protect[ing] the abusing parent" under West Virginia law. *Id.* (quotation omitted).

In short, Grimmett had probable cause to file the abuse and neglect petition—even if a court later found no abuse. *See Texas v. Brown*, 460 U.S. 730, 742 (1983) (emphasizing probable cause does not require the official's reasonable belief be ultimately proven correct).

Even if Mrs. Hall proved a First Amendment violation, Grimmett would still be entitled to qualified immunity. Mrs. Hall has not cited, nor has this Court found, "any precedent which prohibits state actors from proceeding with a previously threatened civil action following an individual's exercise of a Free Speech right." *Nance v. Cty. of Albemarle, N.C.*, 520 F. Supp. 3d 758, 788 (M.D.N.C. 2021) (surveying Fourth Circuit precedent back to the 1980s).

Accordingly, the Court **DENIES** Plaintiffs' summary judgment and **GRANTS** Defendants' summary judgment on this claim.

## B

Plaintiffs fare no better with their Fourth Amendment claims. The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. amend. IV; *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). Plaintiffs allege: (1) Mrs. Hall was unlawfully seized on November 3, 2021, *see* Am. Compl. ¶¶ 54–59; (2) Defendants unlawfully searched their house on

April 6, 2022, *see id.* ¶¶ 60–66; and (3) Defendants unlawfully seized Plaintiffs on April 6, 2022, *see id.* ¶ 67. Both sides request summary judgment. *See* Pls.' Mem. Liability at 18–23; Grimmett Mem. at 8–12. None of Plaintiffs' claims have merit.

## 1

Mrs. Hall first argues she was unlawfully seized on November 3, 2021. *See id.* ¶¶ 54–59. The Court disagrees. A person is seized under the Fourth Amendment if "by means of physical force or a show of authority" their "freedom of movement is constrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). However, not all seizures are unconstitutional—only unreasonable ones. *See Torres v. Madrid*, 592 U.S. 306, 325 (2021). Reasonableness turns on "customary social usage," *Georgia v. Randolph*, 547 U.S. 103, 121 (2006), and the "general habits of the community," *United States v. Taylor*, 624 F.3d 626, 634 (4th Cir. 2010).

Two cases are instructive. In *United States v. Taylor*, a police officer attempted to reunite a four-year-old girl with her parents after police discovered her walking alone on the street. *See* 624 F.3d 626, 628 (4th Cir. 2010). After the girl identified her home, the officer announced his presence. *See id.* at 629. A male voice responded from an upstairs room. *See id.* The officer walked the girl upstairs. *See id.* Upon entering the room, the officer noticed a plastic bag with bullets. *See id.* When the man became angry with the girl and refused to provide evidence he resided at the home, the officer conducted a protective sweep of the room and uncovered a handgun. *See id.* The Fourth Circuit upheld the search. The Court stressed it is "not unreasonable to determine if [a] child may be safely left at its home." *Id.* at 633 (quoting *In re Dawn O.*, 128 Cal. Rptr. 852, 852 (Cal. Ct. App. 1976)). Indeed, the Court found it "difficult to believe" the officer's "solicitude for the interests of both parents and the children" violated the "customary social understanding" underlying the Fourth Amendment's reasonableness inquiry. *Id.* at 633.

Similarly, in *United States v. Laudermilt*, police officers responded to a domestic dispute after four calls revealed a male was "threatening [a woman] and her family with a gun at his home." 677 F.3d 605, 608 & n.1 (4th Cir. 2012). After briefly interviewing people exiting the house, the officers learned the male "was inside the house with a gun." *Id.* The officers entered the home, performed a protective sweep for the gun, and discovered a fourteen-year-old autistic child "shaking" and "talking on the phone with his mother." *Id.* When police asked the child where the gun was, the child "walked to a pantry off the kitchen and pointed to a rifle sitting in plain view on a gun rack." *Id.* at 608–09. The Fourth Circuit upheld the search—including securing the child. Relying on *Taylor*, the Court emphasized police have a duty to ensure the safety of persons in their custody—especially scared fourteen-year-old autistic children. *See id.* at 612.

These cases resolve Mrs. Hall's unlawful seizure claim. When Pauley, Martin, Hudson, and Jude showed up to the Hall residence, they had limited—but worrisome—information. A man lobbed threats with a pistol during an altercation with his wife. *See* Pauley Mot., Ex. 1 at 1. When they knocked, no one answered. *See id.* Concerned, the officers entered the premises searching for signs of life. *See id.* The officers soon learned Mrs. Hall's two children fled their home to a neighbor's house for refuge. *See id.* When Martin took their statements, both children detailed their Mr. Hall's threats with a firearm. *See id.*, Exs. 8 (detailing Mr. Hall's grabbing, smashing, and choking), 9 (referencing Mr. Hall's grabbing). During this time, Martin communicated with Pauley "via the radio." Pauley Dep. 20:13–15.

When Mrs. Hall returned home, the officers still had limited information. Mr. Hall had not yet returned. No one knew his whereabouts. *See* Pauley Dep. at 26:3–10; 33:8–10; A. Hall Dep. at 72:18–22. Before returning her children, police interviewed Mrs. Hall. *See id.* at 97:24–98:3. After the interview finished, the police returned Mrs. Hall's children to her. *See* A. Hall Dep. at 98:7–9.

The Court finds "nothing unreasonable in this chain of events." *Taylor*, 624 F.3d at 633. Defendants entered "an emergent situation involving domestic violence and a firearm." *Laudermilt*, 677 F.3d at 612. Leading up to Mrs. Hall's interview, the officers discovered an empty house, learned the children fled to their neighbors, and recorded statements depicting a violent altercation between Mr. and Mrs. Hall. Both parents vanished. So did the firearm. Mrs. Hall's interview was "born of" this escalating situation. *Laudermilt*, 677 F.3d at 612. Looking after "the reasonable safety requirements of persons in their custody," the officers interviewed Mrs. Hall to learn what happened and to assess whether returning her children would be safe. *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000). In short, the Court finds no fault in Defendants' attention to the children's interests. *See Laudermilt*, 677 F.3d at 612; *Taylor*, 624 F.3d at 633.

Accordingly, the Court **DENIES** Plaintiffs summary judgment and **GRANTS** Defendants summary judgment on this claim.

## 2

Plaintiffs next argue Defendants unlawfully searched their home on April 6, 2022. *See* Am. Compl. ¶¶ 60–66; Pls' Mem. Liability at 18–23. Plaintiffs also allege they were unlawfully seized during the search. *See* Am. Compl. at ¶ 67.

Because probable cause supported the search warrant, *see supra* Part I.A.2, Plaintiffs' claims fail, *see United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) ("A warrant is constitutionally sound when issued by a natural magistrate and supported by probable cause."); *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (permitting officers to detain occupants of a residence while executing a valid search warrant). Accordingly, the Court **DENIES** Plaintiffs summary judgment and **GRANTS** Defendants summary judgment on these claims.

## II

In Count II, Plaintiffs assert *Monell* liability against the Putnam County Commission. *See* Am. Compl. ¶¶ 78–84. Both sides request summary judgment. *See* Pls' Mot. *Monell*; Pauley Mem. at 18–20.

Because Plaintiffs fail to establish any constitutional violation, *see supra* Part I, their *Monell* claim fails, *see Meeks v. McClung*, 2023 WL 8791686, at *14 (S.D. W. Va. Dec. 19, 2023). Accordingly, the Court **DENIES** Plaintiffs summary judgment and **GRANTS** Defendants summary judgment on this claim.

## III

In Count III, Plaintiffs allege abuse of process. *See* Am. Compl. ¶¶ 85–91. They cite the search warrant and abuse and neglect petition for support. *See id.* ¶ 86–87. Grimmett requests summary judgment. *See* Grimmett Mot. at 15–18. Neither claim has merit.

Abuse of process consists of the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process. *See Preiser v. MacQueen*, 352 S.E.2d 22, 28 (W. Va. 1985). The tort focuses on the "use of the process itself" not on the "initiation of the process." *Ballock v. Costlow*, 420 F. Supp. 3d 146, 158 (N.D. W. Va. 2019). To succeed, a plaintiff must prove an "ulterior purpose" and a "willful act in the use of the process not proper in the conduct of the proceeding." *Preiser*, 352 S.E.2d at 28 n.8. There is "no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.*

Assuming Grimmett possessed an "ulterior purpose" in obtaining the search warrant and filing the abuse and neglect petition, Plaintiffs present no evidence Defendant did anything but "carry out" both processes to their "authoriz[ed] conclusion[s]." *Id.* Their claims, therefore, fail.

As to the search warrant, Grimmett executed the search warrant on April 6, 2022. *See* Pauley Liability Mot., Ex. R, ECF No. 151-19. Three officers attended the search: Heather Grimmett, J.B. Grimmett, and J.T. Vieth. *See* Grimmett Dep. at 73:1–3. Together, the officers searched the premises for Mr. Hall's firearm. *See id.* at 71:3–4. They searched bedrooms, hallways, the kitchen, and bathrooms. *See* Pauley Liability Mot, Ex. S, ECF No. 151-20. During the search, the officers required the Halls to sit on the living room couch. *See* Grimmett Dep. at 74:23–75:19. The officers dumped trash out in the kitchen. *See id.* at 72:22. *See also* Pls.' Liability Mot., Ex. S at 1, 3, 4 15, 17. After Grimmett completed a property receipt, the officers left. *See* Pls.' Liability Mot., Ex. R at 2 (stating the search lasted one hour).

None of these actions is improper in executing a search warrant. *See Yanez-Marquez v. Lynch*, 789 F.3d 434, 471 (4th Cir. 2015) (underscoring the safety concerns behind the police's ability to "detain the occupants of the premises while a search is conducted) (citation omitted); *James v. Tunnell*, 2010 WL 2519654, at *6 (S.D. Ohio Jun. 15, 2010) (explaining "[o]fficers are certainly under no duty to put everything back where they found it in the course of the search" so long as they do not spend "hours frolicking through a suspect's home, hanging Christmas lights, dressing up mounted heads, lining up ammunition[,] and playing with personal sexual devices").

As to the abuse and neglect petition, after Grimmett filed the abuse and neglect petition, the prosecutor's office took over the state's case. *See* Grimmett Dep. at 120:18–121:3. Plaintiffs stress a Putnam County Prosecutor's Office legal assistant made a second referral to CPS on the Halls despite never seeing or speaking with Plaintiffs or their children. *See* Pls.' Grimmett Resp. at 11. Although the timing of this referral is uncertain, *see id.* at 12, the referral does not speak to whether peculiarities arose in the "conduct of" the abuse and neglect proceedings initiated by the June 9, 2022 petition. *Preiser*, 352 S.E.2d at 28 n.8. Yes, the referral may have sparked a separate

-30-

investigation. But Plaintiffs fail to connect the dots. They do not show a separate investigation would—or did—affect how the abuse and neglect proceeding initiated from the June 9th petition proceeded. In fact, Greensage himself testified such a separate request would have no effect because it would be added to an ongoing investigation. *See* Greensage Dep. at 46:16–17 (explaining if a second referral existed, it would be "immediately attached to an already open investigation"). Without evidence suggesting otherwise, Plaintiffs' claim fails. *See Williamson v. Harden*, 214 W. Va. 77, 80–81 (W. Va. 2003) (holding no abuse of process claim when alleged wrongful conduct occurred in another case with no bearing on the proceeding at issue).

Accordingly, the Court **GRANTS** Defendants summary judgment on this claim.

## IV

In Count IV, Plaintiffs assert an intentional infliction of emotional distress claim. *See* Am. Compl. ¶¶ 92–94. As to Defendants Pauley, Hudson, Martin, and Jude, Plaintiffs' claims stem from their actions on November 3, 2021 and Pauley's CPS referral on January 12, 2022. *See* Pauley's Mem. at 14–15; Pls.' Pauley Resp. at 16–17. As to Defendant Grimmett, Plaintiffs' claims stem from her application and execution of the search warrant and filing the abuse and neglect petition. *See* Grimmett's Mem. at 18–19; Pls.' Grimmett Resp. at 13–14. Defendants request summary judgment. *See* Pauley Mem. at 14–15; Grimmett's Mem. at 18–19.

To prevail on an intentional infliction of emotional distress claim, the plaintiff must demonstrate the alleged conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 705 (W. Va. 1982). The conduct must "arouse" the average community member's "resentment against the actor and lead him to exclaim, 'Outrageous!'" *Tanner v. Rite Aid of W. Va., Inc.*, 461 S.E.2d 149, 157

-31-

(W. Va. 1995) (citation omitted). Notably, it is difficult to establish "even distasteful police conduct rises to the level of extreme and outrageous conduct." *Carter v. Luciano*, 2023 WL 3956201, at \*6 (S.D. W. Va. June 12, 2023) (reviewing caselaw).

This case is no exception. Plaintiffs fail to prove any unlawful activity. *See supra* Parts I (no constitutional violation), II (no abuse of process violation); *infra* Part V (no spoliation violation). With no underlying unlawful activity, Plaintiffs' IIED claim fails. *See, e.g.*, *Sammons v. Sowards*, 2022 WL 828952, at \*9 (S.D. W. Va. Mar. 18, 2022) (finding no IIED claim because no constitutional violations occurred during the police investigation and explaining a "proper investigation, even if mistaken, is not outrageous conduct as a matter of law").

Accordingly, the Court **GRANTS** Defendants summary judgment on this claim.

V

In Count V, Plaintiffs assert a spoliation of evidence claim. *See* Am. Compl. ¶¶ 95–100. They allege Defendants Pauley, Hudson, and Jude "intentionally deleted recorded statements made by Plaintiff on November 3, 2021" when she made statements they "did not want her to state." *Id.* ¶ 97. Defendants request summary judgment. *See* Pauley Mem. at 16–18.

An intentional spoliation of evidence claim has seven elements: (1) a pending or potential civil action; (2) knowledge of the spoliator of the pending or potential civil action; (3) willful destruction of evidence; (4) the spoliated evidence was vital to a party's ability to prevail in the pending or potential civil action; (5) the intent of the spoliator to defeat a party's ability to prevail in the pending or potential civil action; (6) the party's inability to prevail in the civil action; and (7) damages. *See Hannah v. Heeter*, 584 S.E.2d 560, 573 (W. Va. 2003). The "gravamen of the tort" is the intent to defeat a person's ability to prevail in a civil action." *Id.* As a result, the plaintiff

-32-

must show "the evidence was destroyed with the specific intent to defeat a pending or potential lawsuit." *Id.* (emphasis in original removed).

After discovery, the record remains unhelpful to Plaintiffs as to when spoliation occurred. *See* Greensage Dep. at 24:24–25:12 ("I was trying to find [the allegedly deleted recording] so I could listen to it and get a better understanding of what happened that night. In my attempts to track it down, later on ended up speaking with a deputy. He helped me understand that they had gotten rid of that forensic interview."). Even assuming Defendants knew or "should have anticipated a potential civil action in this case," Plaintiffs fail to provide "even a scintilla of evidence" suggesting Defendants destroyed the recordings to defeat Plaintiffs' ability to prevail in this civil action. *Brown v. State Farm Mut. Automobile Ins. Co.*, 2020 WL 201220, at *3 (W. Va. Jan. 13, 2020) (memorandum decision). According to Greensage, Defendants deleted recordings—if they existed—because they "could not be used as evidence" as the "person who had done the interview that night with the mother . . . was not certified or able to do forensic interviews." Greensage Dep. at 25:9–11. Of course, the Court must draw all reasonable inferences in favor of Plaintiffs at this stage. *See Variety Stores, Inc.*, 888 F.3d at 659. But the Court cannot twist the record to say what it plainly does not. Greensage's testimony suggests Defendants destroyed the recordings because of who recorded them—not to thwart Plaintiffs' chances at success in this litigation. Plaintiffs offer no evidence contradicting or undermining their own witness.

Accordingly, the Court **GRANTS** Defendants summary judgment on this claim.

## CONCLUSION

The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment on Liability; **DENIES** Plaintiffs' Motion for Partial Summary on *Monell* Liability; **GRANTS** Defendants Heather B. Grimmett, J.B. Grimmett, and Deputy Veith's Motion for Summary Judgment; and

**GRANTS** Defendants Brian Hudson, Donathan Jude, Steve Martin, Brandon Pauley, & Putnam County Commission's Motion for Summary Judgment.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        February 12, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE